# EXHIBIT A

24 CV 000144

## STATE OF NORTH CAROLINA

NEW HANOVER County

| File No. |
|---|
| 23-CVS- |

In The General Court Of Justice
☐ District ☒ Superior Court Division

| *Name Of Plaintiff* |
|---|
| New Hanover County |
| *Address* |
| c/o Baron & Budd, P.C., 3102 Oak Lawn Ave., Suite 1100 |
| *City, State, Zip* |
| Dallas, TX 75219-4281 |

**CIVIL SUMMONS**
☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

### VERSUS

| *Name Of Defendant(s)* |
|---|
| The Chemours Company, et al. |

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) Issued*

**To Each Of The Defendant(s) Named Below:**

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| Tyco Fire Products, LP<br>c/o CT Corporation System<br>160 Mine Lake Ct., Suite 200<br>Raleigh, NC 27615 | |



**IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out!
You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as
possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales.
¡NO TIRE estos papeles!
Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible
acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos
documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and
2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

*A TRUE COPY
CLERK OF SUPERIOR COURT
NEW HANOVER COUNTY
BY: [signature]
Deputy Superior Court*

| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)* | *Date Issued* 1-12-24 | *Time* 3:28 ☐ AM ☒ PM |
|---|---|---|
| A. Charles Ellis<br>Ward and Smith, P.A.<br>Post Office Box 8088<br>Greenville, NC 27835 | *Signature* [signature] | |
| | ☒ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time* ☐ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration and, if so, what procedure is to be followed.*

(Over)

| RETURN OF SERVICE |
|:-:|

I certify that this Summons and a copy of the complaint were received and served as follows:

## DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 4/18
© 2018 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

NEW HANOVER County

| File No. |
| --- |
| 24-CVS- |

In The General Court Of Justice
☐ District  ☒ Superior Court Division

**Name And Address Of Plaintiff 1**
New Hanover County
c/o Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219-4281

2024 JAN 12 P 3: 28

NEW HANOVER CO. C.S.C.

BY:

**Name And Address Of Plaintiff 2**

## GENERAL
## CIVIL ACTION COVER SHEET

☒ INITIAL FILING   ☐ SUBSEQUENT FILING

Rule 5(b) of the General Rules of Practice for the Superior and District Courts

### VERSUS

**Name And Address Of Defendant 1**
The Chemours Company
c/o CT Corporation System
160 Mine Lake Ct., Suite 200
Raleigh, NC 27615

**Summons Submitted** ☒ Yes ☐ No

*A TRUE COPY*
CLERK OF SUPERIOR COURT
NEW HANOVER COUNTY
BY: *M. Kim Olinger*
Deputy Clerk of Superior Court

**Name And Address Of Defendant 2**
The Chemours Company FC, LLC
c/o CT Corporation System
160 Mine Lake Ct., Suite 200
Raleigh, NC 27615

**Summons Submitted** ☒ Yes ☐ No

**Name And Address Of Attorney Or Party, If Not Represented**
(complete for initial appearance or change of address)
A. Charles Ellis
Ward and Smith, P.A.
Post Office Box 8088
Greenville, NC 27835

| Telephone No. 252-215-4000 | Cellular Telephone No. |
| --- | --- |

| NC Attorney Bar No. 10865 | Attorney Email Address ace@wardandsmith.com |
| --- | --- |

☒ Initial Appearance in Case  ☐ Change of Address

| Name Of Firm Ward and Smith, P.A. | Fax No. 252-215-4077 |
| --- | --- |

**Counsel For**
☒ All Plaintiffs  ☐ All Defendants  ☐ Only: (list party(ies) represented)

☒ Jury Demanded In Pleading   ☐ Complex Litigation   ☐ Stipulate to Arbitration

## TYPE OF PLEADING

(check all that apply)

☐ Amend (AMND)
☐ Amended Answer/Reply (AMND-Response)
☐ Amended Complaint (AMND)
☐ Assess Costs (COST)
☐ Answer/Reply (ANSW-Response) (see Note)
☐ Change Venue (CHVN)
☒ Complaint (COMP)
☐ Confession Of Judgment (CNFJ)
☐ Consent Order (CONS)
☐ Consolidate (CNSL)
☐ Contempt (CNTP)
☐ Continue (CNTN)
☐ Compel (CMPL)
☐ Counterclaim (CTCL) Assess Court Costs
☐ Crossclaim (list on back) (CRSS) Assess Court Costs
☐ Dismiss (DISM) Assess Court Costs
☐ Exempt/Waive Mediation (EXMD)
☐ Extend Statute Of Limitations, Rule 9 (ESOL)
☐ Extend Time For Complaint (EXCO)
☐ Failure To Join Necessary Party (FJNP)

☐ Failure To State A Claim (FASC)
☐ Implementation Of Wage Withholding In Non-IV-D Cases (OTHR)
☐ Improper Venue/Division (IMVN)
☐ Including Attorney's Fees (ATTY)
☐ Intervene (INTR)
☐ Interplead (OTHR)
☐ Lack Of Jurisdiction (Person) (LJPN)
☐ Lack Of Jurisdiction (Subject Matter) (LJSM)
☐ Modification Of Child Support In IV-D Actions (MSUP)
☐ Notice Of Dismissal With Or Without Prejudice (VOLD)
☐ Petition To Sue As Indigent (OTHR)
☐ Rule 12 Motion In Lieu Of Answer (MDLA)
☐ Sanctions (SANC)
☐ Set Aside (OTHR)
☐ Show Cause (SHOW)
☐ Transfer (TRFR)
☐ Third Party Complaint (list Third Party Defendants on back) (TPCL)
☐ Vacate/Modify Judgment (VCMD)
☐ Withdraw As Counsel (WDCN)
☐ Other (specify and list each separately)

**NOTE:** *All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must include either a General Civil (AOC-CV-751), Motion (AOC-CV-752), or Court Action (AOC-CV-753) cover sheet.*

(Over)

AOC-CV-751, Rev. 3/19, © 2019 Administrative Office of the Courts

| | | | CLAIMS FOR RELIEF | | | |
|---|---|---|---|---|---|---|
| ☐ Administrative Appeal (ADMA) | ☐ Limited Driving Privilege - Out-Of-State Convictions (PLDP) | ☒ Product Liability (PROD) |
| ☐ Appointment Of Receiver (APRC) | | ☐ Real Property (RLPR) |
| ☐ Attachment/Garnishment (ATTC) | ☐ Medical Malpractice (MDML) | ☐ Specific Performance (SPPR) |
| ☐ Claim And Delivery (CLMD) | ☐ Minor Settlement (MSTL) | ☒ Other *(specify and list each separately)* |
| ☐ Collection On Account (ACCT) | ☐ Money Owed (MNYO) | Public Nuisance; Private Nuisance; |
| ☐ Condemnation (CNDM) | ☐ Negligence - Motor Vehicle (MVNG) | Breach of Implied Warranty of |
| ☐ Contract (CNTR) | ☒ Negligence - Other (NEGO) | Merchantability; Trespass to Real |
| ☐ Discovery Scheduling Order (DSCH) | ☐ Motor Vehicle Lien G.S. Chapter 44A (MVLN) | Property; Civil Conspiracy; Negligence |
| ☐ Injunction (INJU) | ☐ Possession Of Personal Property (POPP) | Per Se; Fraudulent Transfer |

| Date | Signature Of Attorney/Party |
|---|---|
| 01/12/2024 | B. Charles Ellis by John M Marc |

**FEES IN G.S. 7A-308 APPLY**
Assert Right Of Access (ARAS)
Substitution Of Trustee (Judicial Foreclosure) (RSOT)
Supplemental Procedures (SUPR)

**PRO HAC VICE FEES APPLY**
Motion For Out-Of-State Attorney To Appear In NC Courts In A Civil Or Criminal Matter (Out-Of-State Attorney/Pro Hac Vice Fee)

| No. | ☐ Additional Plaintiff(s) | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

| No. | ☒ Additional Defendant(s)   ☐ Third Party Defendant(s) (SEE ATTACHED SHEET FOR ADDITIONAL DEFENDANTS) | Summons Submitted |
|---|---|---|
| 3 | E. I. DU PONT DE NEMOURS AND COMPANY | ☒ Yes  ☐ No |
| 4 | DUPONT DE NEMOURS, INC. | ☒ Yes  ☐ No |
| 5 | CORTEVA, INC. | ☒ Yes  ☐ No |
| 6 | 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.) | ☒ Yes  ☐ No |
| 7 | AGC CHEMICALS AMERICAS INC. | ☒ Yes  ☐ No |

*Plaintiff(s) Against Whom Counterclaim Asserted*

| | |
|---|---|
| | |
| | |
| | |

*Defendant(s) Against Whom Crossclaim Asserted*

| | |
|---|---|
| | |
| | |
| | |

AOC-CV-751, Side Two, Rev. 3/19
© 2019 Administrative Office of the Courts

# ATTACHMENT TO COVER SHEET

| DEFENDANTS | SUMMONS SUBMITTED |
|---|---|
| AGC, INC. (f/k/a Asahi Glass Co., Ltd.) | Y |
| ARCHROMA MANAGEMENT, LLC | Y |
| ARCHROMA U.S., INC. | Y |
| ARKEMA, INC. | Y |
| BASF CORPORATION | Y |
| BUCKEYE FIRE EQUIPMENT COMPANY | Y |
| CARRIER GLOBAL CORPORATION | Y |
| CHEMDESIGN PRODUCTS, INC. | Y |
| CHEMGUARD, INC. | Y |
| CHEMICALS INCORPORATED | Y |
| CHUBB FIRE, LTD. | Y |
| CLARIANT CORPORATION | Y |
| DEEPWATER CHEMICALS, INC. | Y |
| JOHN DOE DEFENDANTS 1-49 | Y |
| DYNAX CORPORATION | Y |
| KIDDE PLC, INC. | Y |
| NATION FORD CHEMICAL COMPANY | Y |
| NATIONAL FOAM, INC. | Y |
| RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation) | Y Y |
| TYCO FIRE PRODUCTS LP | Y |
| UTC FIRE & SECURITY AMERICAS CORPORATION, INC. | Y |

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

NEW HANOVER COUNTY,

               Plaintiff,

v.

THE CHEMOURS COMPANY; THE
CHEMOURS COMPANY FC, LLC; E. I. DU
PONT DE NEMOURS AND
COMPANY; DUPONT DE NEMOURS,
INC.; CORTEVA, INC.; 3M COMPANY
(f/k/a Minnesota Mining and Manufacturing
Co.); AGC CHEMICALS AMERICAS INC.;
AGC, INC. (f/k/a Asahi Glass Co., Ltd.);
ARCHROMA MANAGEMENT, LLC;
ARCHROMA U.S., INC.; ARKEMA, INC.;
BASF CORPORATION; BUCKEYE FIRE
EQUIPMENT COMPANY; CARRIER
GLOBAL CORPORATION; CHEMDESIGN
PRODUCTS, INC.; CHEMGUARD, INC.;
CHEMICALS INCORPORATED; CHUBB
FIRE, LTD.; CLARIANT CORPORATION;
DEEPWATER CHEMICALS, INC.; JOHN
DOE DEFENDANTS 1-49; DYNAX
CORPORATION; KIDDE PLC, INC.;
NATION FORD CHEMICAL COMPANY;
NATIONAL FOAM, INC.; RAYTHEON
TECHNOLOGIES CORPORATION (f/k/a
United Technologies Corporation); TYCO
FIRE PRODUCTS LP; and UTC FIRE &
SECURITY AMERICAS CORPORATION,
INC.,

               Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24-CVS-_____

A TRUE COPY
CLERK OF SUPERIOR COURT
NEW HANOVER COUNTY
BY: *M. Kim Olinger*
Deputy Clerk of Superior Court

**COMPLAINT**

Plaintiff New Hanover County ("County" or "Plaintiff") brings this action

against Defendants The Chemours Company; The Chemours Company FC, LLC;

Defendant E. I. du Pont de Nemours and Company; DuPont de Nemours, Inc.; Corteva, Inc.; 3M Company; Chemguard Inc.; Tyco Fire Products, LP; Ansul Company; National Foam Inc.; Angus Fire Armour Corporation; Buckeye Fire Equipment Company; AGC Chemical Americas, Inc.; AGC Inc. f/k/a Asahi Glass Co.; Archroma Management LLC; Archroma US, Inc.; Arkema Inc.; BASF Corporation; Carrier Global Corporation; ChemDesign Products, Inc.; Chemicals Inc.; Chubb Fire, LTD.; Clariant Corp.; Deepwater Chemicals, Inc.; Dynax Corp.; Kidde PLC Inc.; Nation Ford Chemical Company; Raytheon Technologies Corporation f/k/a United Technologies Corporation; UTC Fire & Security Americas Corporation; and John Doe Defendants 1-49 (collectively, "Defendants"). Plaintiff hereby alleges, upon information and belief, as follows:

## I. INTRODUCTION

1. The events giving rise to this Complaint are part of a decades-long history of Defendants' blatant contamination of North Carolina's air, groundwater, and surface water with per- and polyfluoroalkyl substances ("PFAS"). As has been widely reported, certain Defendants have used the environment surrounding the Fayetteville Works facility as a dumping ground for hundreds of chemicals while assuring the Environmental Protection Agency (EPA) and state agencies that they were doing no such thing. Other Defendants designed, manufactured, marketed, and/or sold PFAS and/or products containing PFAS, including but not limited to

2

aqueous film-forming foam ("AFFF"), a fire-extinguishing foam that causes widespread PFAS contamination.

2.  *For nearly forty years,* the DuPont Entities (as defined below) secretly discharged GenX and other PFAS compounds from their Fayetteville Works facility directly into the Cape Fear River and pumped millions of pounds of per- and polyfluoroalkyl substances (PFAS) into the air above Fayetteville Works. The Cape Fear River runs downstream from Fayetteville Works to New Hanover County. Contaminated Cape Fear River water has been used in New Hanover County and has caused extensive contamination throughout.

3.  *For almost fifty years,* all Defendants designed, manufactured, marketed, and/or sold PFAS and/or products containing PFAS, including but not limited to aqueous film-forming foam ("AFFF") (collectively, "Fluorosurfactant Products"). Defendants designed, manufactured, formulated, distributed, marketed, and/or sold Fluorosurfactant Products with the knowledge that these compounds were toxic and that they would be released into the environment even when used as directed and intended by Defendants. The handling, storage, and use of Fluorosurfactant Products caused contamination of air, groundwater, and surface water throughout the County.

4.  New Hanover County brings this suit to recover the costs of addressing PFAS contamination and to compensate the County for harm it has incurred and will incur as a result of Defendants' actions.

3

## II.  **PARTIES**

5.    Plaintiff New Hanover County is a governmental entity formed under the laws of the State of North Carolina, maintaining its principal office at New Hanover County Government Center, 230 Government Center Drive, Wilmington, North Carolina, 28403.

6.    Plaintiff owns the majority of the property constituting the Wilmington International Airport located just north of Wilmington, North Carolina. The Airport property opened in 1928 and has continuously operated since as a military and commercial airport under different names.

7.    PFAS including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), have been discovered in the water and soil throughout the County.   This Complaint refers to the County's real property and water resources --- including, but not limited to --- County-owned properties, County-owned waterbodies, the Wilmington International Airport, the lands surrounding the airport, the soils, groundwater, and surface water bodies on Airport property as "Plaintiff's Property."

8.    Defendant E. I. du Pont de Nemours and Company is a Delaware corporation with its principal place of business in Wilmington, Delaware, and is registered to do business as a foreign corporation in the State of North Carolina. DuPont owned and operated the Fayetteville Works facility from approximately 1971

4

until 2015 and currently leases a portion of the Site from Defendant Chemours Company FC, LLC.

9.      Defendant The Chemours Company is a Delaware corporation with its principal place of business in Wilmington, Delaware, and is registered to do business as a foreign corporation in the State of North Carolina. Chemours was a wholly owned subsidiary of DuPont when it first took over its Performance Chemicals Business in February 2015. In July 2015, DuPont completed its spinoff of Chemours as a separate public entity. In connection with the spinoff, Chemours assumed at least some portion of liability for DuPont's decades-long history of causing widespread PFAS contamination in the state and elsewhere.

10.     Defendant The Chemours Company FC, LLC is Delaware limited liability company with its principal place of business in Wilmington, Delaware, and is registered to do business as a foreign corporation in the State of North Carolina. Chemours Company FC has owned the Fayetteville Works Site since January 2015. The Chemours Company FC, LLC is a subsidiary of The Chemours Company, and the two entities are referred to in this complaint as "Chemours."

11.     Defendant Du Pont de Nemours, Inc., formerly known as Dow-DuPont Inc., is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. New DuPont does business throughout the United States, including conducting

5

business in North Carolina. New DuPont may be served at its principal place of business, or wherever it may be found.

12.    Defendant Corteva, Inc. ("Corteva") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at P.O. Box 80735, Chestnut Run Plaza 735, Wilmington, Delaware 19805. Corteva does business throughout the United States, including conducting business in North Carolina, and is registered to do business in North Carolina with the Secretary of State. Corteva may be served at its principal place of business, through the North Carolina Secretary of State, or wherever it may be found.

13.    Collectively, the Defendants identified in paragraphs 5-9 are referred to as "the DuPont Entities." Upon information and belief, all DuPont Entities hold liability for PFAS releases from Fayetteville Works.

14.    3M: Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires at numerous military bases, airports, and other locations throughout the country.

15.    3M is the only company that manufactured and/or sold AFFF containing PFOS.

6

16. AGC: Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

17. AGC AMERICA: Defendant AGC Chemical Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.

18. ANGUS: Defendant Angus Fire maintains corporate headquarters in Bentham, United Kingdom. Angus Fire manufactured, marketed and sold AFFF products that contained PFOA.

19. ANSUL: Defendant Ansul Company is a corporation organized and existing under the laws of the State of Wisconsin. This Defendant manufactured, marketed, and sold AFFF products that contained PFOA.

20. ARCHROMA MANAGEMENT LLC: Defendant Archroma Management, LLC, is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel- Land, Switzerland.

21. ARCHROMA US: Defendant Archroma U.S., Inc. ("Archroma US") is a Delaware corporation with its principal place of business located at 5435 77 Center

7

Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF.

22. ARKEMA: Defendant Arkema, Inc. is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema, Inc. is an operating subsidiary of Arkema France, S.A.

23. BASF: Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.

24. BUCKEYE: Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. This Defendant manufactured and sold AFFF that contained PFOA.

25. CARRIER: Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

26. CHEM INC.: Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521.

27.    CHEMDESIGN: Defendant Chemdesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.

28.    CHEMGUARD: Defendant Chemguard, Inc. ("Chemguard") is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. This Defendant manufactured and sold AFFF that contained PFOA.

29.    CHUBB: Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is registered in the United Kingdom with a registered number of 134210. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to Chubb Fire & Security Ltd., Chubb Security, P.L.C., Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Chubb is part of UTC Climate, Controls & Security, a unit of United Technologies Corporation.

30.    CLARIANT: Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205.

31.    DEEPWATER: Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801.

9

32. DYNAX: Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF.

33. KIDDE PLC: Defendant Kidde P.L.C., Inc. ("Kidde P.L.C.") is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut 06032. Upon information and belief, Kidde PLC was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

34. NATIONAL FOAM: Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam manufactures the Angus Fire brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). This Defendant manufactured and sold AFFF that contained PFOA.

35. NATION FORD: Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715.

36. RAYTHEON TECHNOLOGIES CORP.: Defendant Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon Tech f/k/a United Tech") is a Delaware corporation with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032.

10

37.     TYCO: Defendant Tyco Fire Products L.P. ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Tyco is an indirect subsidiary that is wholly owned by Johnson Controls International P.L.C., an Irish public limited company listed on the New York Stock Exchange  Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco"). At all times relevant, Tyco manufactured, marketed, promoted, distributed, and/or sold fire suppression products, including AFFF that contained fluorocarbon surfactants containing PFAS.

38.     UTC: Defendant UTC Fire & Security Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.) ("UTC") is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092. UTC was a subsidiary of United Technologies Corporation.

39.     Upon information and belief, Defendant John Does 1-49 were manufacturers and/or sellers of AFFF products. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time the County will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

40.     All Defendants identified above, including the DuPont Entities, are referred to as the "Manufacturing Defendants."

41.     All of the foregoing Defendants, upon information and belief, have previously conducted and/or currently conduct their business throughout the United States. Moreover, some of the foregoing Defendants, if not all, have conducted and/or are currently conducting business in the state of North Carolina.

42.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

43.     The term "Defendants," without naming any specific one, refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

### III.     JURISDICTION & VENUE

44.     The Superior Court has jurisdiction over this action for costs, damages, and other relief stemming from Defendants' actions because the amount in controversy exceeds twenty-five thousand dollars ($25,000), per N.C. Gen. Stat. § 7A.

45.    New Hanover County is a proper venue for this action under North Carolina General Statutes Subchapter IV, Article 7, Section 1-80 as facts giving rise to the Plaintiff's causes of action arose in New Hanover County, and the plaintiff is situated in, resides, and does business in this County.

## IV.    **FACTUAL ALLEGATIONS**

*A.    The Contaminants: PFOS and PFOA*

46.    PFOS and PFOA are man-made chemicals within a class known as PFAS. Each PFAS compound is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which makes these compounds particularly persistent in the environment.

47.    PFAS are sometimes described as "long-chain" and "short-chain," depending on the number of carbon atoms contained in the carbon chain. PFOS and PFOA are considered long-chain PFAS because they contain eight carbon atoms in their chains; short-chain PFAS have six or less carbon atoms in their chains. PFOS and PFOA each contain eight carbon-fluorine bonds. For this reason, they are sometimes referred to as "C8."

48.    PFOS and PFOA are highly water soluble, which increases the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water. Their mobility is made more dangerous by their persistence in the

13

environment and resistance to biologic, environmental, or photochemical degradation.[1]

49.    PFOS and PFOA are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil and air, as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.[2]

50.    PFOS and PFOA are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[3]

51.    Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOS and PFOA.

52.    According to the United States Environmental Protection Agency ("EPA,") "...studies indicate that exposure to PFOA and PFOS over certain levels may result in...developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody

---

[1] See EPA, Health Effects Support Document for Perfluorooctane Sulfonate (PFOS), Document No. 822-R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed May 8, 2023); see also EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 16, available at https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100OM4O.txt (last accessed May 8, 2023).

[2] Id.

[3] Id.

production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."[4]

53.    EPA has also warned that "there is suggestive evidence of carcinogenic potential for PFOS."[5]

54.    EPA has noted that drinking water can be an additional source of PFOA/PFOS in the body in communities where these chemicals have contaminated water supplies. In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example...an airfield at which [Fluorosurfactant Products] were used for firefighting."[6]

B.    *Aqueous Film-Forming Foam*

55.    AFFF is a type of water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports and military bases, among other places.

56.    The AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained PFOS and/or PFOA.

---

[4] *See* EPA, *Fact Sheet PFOA & PFOS Drinking Water Health Advisories*, EPA Document Number: 800-F-16-003, available at available at https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100OR9W.txt (last accessed May 8, 2023).

[5] *See* EPA, *Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)*, Document Number: 822 R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed May 8, 2023).

[6] *See* note 4, *supra*.

15

57.     PFOS and/or the chemical precursors to PFOS contained in 3M's AFFF were manufactured by 3M's patented process of electrochemical fluorination ("ECF"). 3M was the only manufacturer that used ECF; all other AFFF producers manufactured fluorosurfactants for use in AFFF through the process of telomerization, which produced fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

58.     AFFF can be made without PFOS or PFOA. Fluorine-free and short-chains foams do not release PFOS or PFOA into the environment.

59.     AFFF is used to extinguish fires that are difficult to fight, particularly fires that involve petroleum or other flammable liquids. AFFF is typically sprayed directly onto a fire, where it works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

60.     When used as the Defendants intended and directed, Defendants' AFFF releases PFOS and/or PFOA into the environment.

61.     Once PFOS and PFOA are free in the environment, they do not hydrolyze, photolyze or biodegrade under typical environmental conditions, and are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, sediment, surface water and groundwater.

62.     The use of Defendants' Fluorosurfactant Products as directed and intended by the Defendants allowed PFOS and PFOA to enter the North Carolina's natural resources, where these compounds migrated through the subsurface and into

16

the groundwater, thereby contaminating the surface water, soil, sediment, and groundwater, as well as causing other extensive and ongoing damage to Plaintiff.

63.     Due to the chemicals' persistent nature, among other things, these chemicals have and continue to cause injury and damage to Plaintiff.

C.     _Defendants' Knowledge of the Hazards Of PFOS and PFOA_

64.     On information and belief, by the early 1980s, Defendants knew or reasonably should have known, among other things, that: (a) PFOS and PFOA are toxic, and (b) when AFFF or other products containing PFOS, PFOA and/or their precursor chemicals is sprayed or otherwise released in the open environment, per the instructions given by the manufacturer, PFOS and PFOA readily migrate through the subsurface, mix easily with surface water and groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

65.     Defendants also knew, or reasonably should have known, that PFOS and PFOA could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOS and PFOA can persist in the body for prolong periods of time.

66.     In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that

17

it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[7]

67. By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

68. DuPont company scientists issued internal warnings about the toxicity associated with PFOA as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care" and that contact with the skin should be "strictly avoided."

69. In 1978, based on information it had received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects were attributable to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of organic fluorine.

70. By 1979, DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

---

[7] *See* Office of Minnesota Attorney General, Exhibit List, No. 1588, Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1588.pdf (last accessed May 8, 2023).

DuPont did not report this data or the results of its worker health analysis to any government agency or community at that time.

71.    The following year, DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

72.    Not only did DuPont know that PFOA accumulated in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. In 1981, DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with fluoropolymers, two—or 25%—had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

73.    In fact, DuPont had reported to the EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but DuPont concealed the results of the study of its own plant workers.

74.    While DuPont knew about this toxicity danger as early as the 1960s, DuPont was also aware that PFAS was capable of contaminating the surrounding environment, leading to human exposure.

75.    By 1980-1981 at the latest, DuPont knew that PFAS compounds could be emitted into the air from its facilities and that those air emissions could travel beyond facility boundaries.

76.    Further, by no later than 1984, DuPont was aware that one of its PFAS

compounds – PFOA – is biopersistent. DuPont was long aware that the PFAS it was releasing from its facilities was leaching into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near DuPont's plant in West Virginia, DuPont, in 1984, held a meeting at its corporate headquarters in Wilmington, Delaware to discuss health and environmental issues related to PFOA (the "1984 Meeting"). DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from DuPont's manufacturing facilities, as well as potential replacement materials. DuPont chose not to use either available technologies or replacement materials, despite knowing PFOA's toxicity.

77.     During the 1984 Meeting, the DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to DuPont's "incremental liability from this point on if we do nothing" because DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within

DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business and that these departments had "no incentive to take any other position."

78.     DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in February 2006, the

ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

79.     In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects – one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[8]

80.     Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that ... exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[9]

---

[8] See DuPont, *C-8 Blood Sampling Results*, available at https://static.ewg.org/files/PFOA_013.pdf?_gl=1*anldwl*_ga*NTgxNzgzMTc3LjE2ODI2ODk5ODk.*_ga_CS21GC49KT*MTY4MzU4Nzg2OC4yLjEuMTY4MzU4Nzk0MC4wMC4wLjAuMA..&_ga=2.26293428.8 85409355.1683587869-581783177.1682689989 (last accessed May 8, 2023).

[9] See 3M, Internal Memorandum, *Organic Fluorine Levels*, (August 31, 1984), available at https://static.ewg.org/files/226-0483.pdf?_gl=1*1u237yp*_ga*NTgxNzgzMTc3LjE2ODI2ODk5ODk.*_ga_CS21GC49KT*MTY4MzU4Nzg2OC4yLjEuMTY4MzU4Nzk0MC4wMC4wLjAuMA..&_ga=2.39402538.8 85409355.1683587869-581783177.1682689989 (last accessed May 8, 2023).

21

81. Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

82. On information and belief, in 2001 DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products that were discharged into the environment and contaminated the County, including its property and its natural resources.

83. DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment. By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History." The EPA fined DuPont $16,500,000 for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."[10]

---

[10] EPA, Consent Agreement and Final Order, *In re E.I. DuPont de Nemours & Co.*, TSCA Docket TSCA-HQ-2004-0016 (Dec. 14, 2005), available at https://www.epa.gov/sites/default/files/documents/dupontpfoasettlement121405.pdf (last accessed May 8, 2023).

84.     By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link"[11] between PFOA exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[12] By October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

85.     In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly-traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

86.     Notwithstanding this knowledge, Defendants negligently and carelessly: (a) designed, manufactured, marketed, distributed, and/or sold Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of (namely, by washing the foam into the soil or

---

[11] Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease.  *See* C8 Panel, *C8 Probable Link Reports*, available at http://www.c8sciencepanel.org/prob_link.html (last accessed May 8, 2023).

[12] *See* C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), available at http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last accessed May 8, 2023).

Case 7:24-cv-00097-FL   Document 1-1   Filed 02/19/24   Page 28 of 88

wastewater system), thus improperly permitting PFOS, PFOA and/or their precursor chemicals to contaminate the County, including its property and natural resources; (c) failed to recall and/or warn the users of Fluorosurfactant Products, negligently designed products containing or degrading into PFOS and/or PFOA, of the dangers of surface water, soil, sediment and groundwater contamination as a result of standard use and disposal of these products; and (d) further failed and refused to issue the appropriate warnings and/or recalls to the users of Fluorosurfactant Products, notwithstanding the fact that Defendants knew or could reasonably ascertain the identities of the purchasers of their Fluorosurfactant Products.

87.    As a direct and proximate result of Defendants' actions and/or inactions alleged in this Complaint, Plaintiff's property and natural resources have been and will continue to be contaminated with PFOA and PFOS, creating an environmental hazard, unless such contamination is remediated. As a direct and proximate result of Defendants' actions and/or inactions, Plaintiff must assess, evaluate, investigate, monitor, treat, remove, clean up, correct, and/or remediate PFOA and PFOS contamination within the County at significant expense, loss, and damage to Plaintiff.

88.    Defendants had a duty and breached their duty to evaluate and test such Fluorosurfactant Products adequately and thoroughly to determine their potential human health and environmental impacts before they sold such products. Defendants

also had a duty and breached their duty to minimize the environmental harms caused by Fluorosurfactant Products.

D.    *The Fayetteville Works Site*

89.    The Fayetteville Works Site is a chemical manufacturing facility located on approximately 2,175 acres of real property located at 22828 NC Highway 87 W, Fayetteville, North Carolina 28306-7332. The Site is located 15 miles southeast of the city of Fayetteville, along the western edge of the Cape Fear River.

90.    The Site's first manufacturing area was constructed in the early 1970s. Currently, the Site manufactures plastic sheeting, safety glass, fluorochemicals, and intermediates for plastics manufacturing. A former manufacturing area, which was sold in 1992, produced nylon strapping and elastomeric tape.[13]

91.    From the early 1970s until 2015, DuPont owned and operated the Fayetteville Works Site. During that time, DuPont discharged millions of pounds of PFAS.

92.    In 2015, The Chemours Company, which at the time was a wholly owned subsidiary of DuPont, acquired Fayetteville Works from DuPont.

93.    In 2015, Defendant Chemours Company FC, LLC, became the owner of the entire 2,177 acre Fayetteville Works Site along with Fluoromonomers, Nafion®

---

[13] See "Corrective Measures Study Work Plan," Chemours Fayetteville Works, RCRA Permit No. NCD047368642- R2-M3, PARSONS, December 2016 (hereinafter, "Parsons").

membranes, and PPA manufacturing units. The polyvinyl fluoride (PVF) resin manufacturing unit remained with the DuPont Company.[14]

94.    Defendants' manufacturing operations at the Site[15] consist of three current perfluorinated chemical ("PFC") manufacturing areas and a former manufacturing area:[16]

a.    Chemours Fluoromonomers and Nafion® Membrane – Manufactures Nafion® fluoropolymer membrane—a perfluorosulfonic acid (PFSA) membrane—for use in electronic cells, as well as various fluorochemicals used for Nafion® membrane, Teflon® fluoropolymer, Viton® elastomers, and other fluorinated products.

b.    Chemours Polymer Processing Aid (PPA) - Manufactures a fluorochemical that is used as a processing aid for off-site fluoropolymer manufacturing—upon information and belief, the product known as "GenX." This area formerly manufactured ammonium perfluorooctanoate (APFO, the ammonium salt of PFOA, which is also known as "C8"). Chemours publicly maintains

---

[14] *Id.*

[15] In two additional manufacturing areas at the Fayetteville Works, Kuraray America manufactures Butacite polyvinyl butyral sheeting and resin, and SentryGlass-branded safety glass products, but upon information and belief does not use or generate the polyfluorinated chemicals at issue.

[16] See Parsons *supra.*

26

that the last date of C8 production at the Site was April 28, 2013, and that the C8 manufactured in this area was never used in any of the other manufacturing facilities at the Site.

c.    DuPont Company PVF - Manufactures polyvinyl fluoride (PVF) resin used to produce Tedlar® film.

d.    The Polymer Manufacturing Development Facility (PMDF) - Manufactured Teflon® fluorinated ethylene propylene (FEP) for electrical wiring insulation and other applications. Since the PMDF unit was permanently shut down in June 2009, it no longer manufactures DuPont Teflon®. Chemours publicly maintains that the Site did not use C8 in its processes.

95.    In addition to the manufacturing operations at the Site, Chemours operates two natural gas-fired boilers and a wastewater treatment plant for the treatment of process and sanitary wastewaters from Chemours and DuPont. Hazardous wastes generated from the Chemours manufacturing processes and laboratories were, as of 2016, managed at the permitted Hazardous Waste Container Storage Area, in four permitted hazardous waste tanks, and at the 90-day ignitable waste accumulation area prior to being shipped offsite for treatment, disposal, or recycling.[17]

---

[17] *Id.*

96. The Site also has at least one stack that has operated since the 1980s. For the majority of the Site's existence, Defendants used a simple waste gas scrubber which caused millions of pounds of PFAS to be released into the air.

97. Hundreds of different types of PFAS have been released into the environment by Defendants. Chemours has identified approximately 30 different PFAS compounds associated with Fayetteville Works. Chemours also prepared a report finding over 250 previously unknown PFAS in its process and non-process wastewater and stormwater at Fayetteville Works.

98. PFAS compounds released from Fayetteville Works are expected to exhibit harmful effects given their structural and functional similarities to PFOA, PFOS, and other PFAS compounds that are known to be toxic at low levels. And recent literature suggests as much and show that other PFAS compounds are associated with similar health outcomes as PFOA and PFOS. Consequently, PFAS contamination in drinking water presents a serious threat to the health of those exposed.

99. PFAS compounds may enter the human body through a number of different pathways. In addition to consumption through liquid or food, PFAS compounds may also be inhaled or absorbed through the skin.

100. Newborns are particularly susceptive to PFAS toxicity. Exposures to newborns can be higher—compared to other subpopulations—through breastmilk,

28

or formula that has been prepared with drinking water contaminated with PFAS compounds.

F.    *DuPont's Knowledge of the Dangers of PFAS*

101.    DuPont began using PFOA and other PFAS in the 1950s and, quickly thereafter, developed an understanding of the dangers of using these chemicals.

102.    During this time, DuPont was aware that PFOA was toxic to animals and humans and that it bioaccumulates and biopersists in the environment. DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment and that tens of thousands of people had been exposed to its PFOA, including via public and private drinking water supplies.

G.    *Manufacture of GenX at Fayetteville Works*

103.    Since 1980, DuPont – and later Chemours – has been aware that GenX and other PFAS was released into the environment around the Fayetteville Works Site, including directly into the Cape Fear River.[18] Plaintiff's harm has most likely resulted from PFAS entering the Cape Fear River rather than direct air deposition, although it is possible air deposition from Fayetteville Works has contributed in part to Plaintiff's PFAS contamination.

---

[18] See page 22 of TSCA Compliance Monitoring Inspection Report, April 24, 2018.
https://www.epa.gov/sites/default/files/2019-02/documents/chemours_r4_sanitized_report.pdf
(last accessed March 10, 2022)

104. Prior to 2002, DuPont purchased PFOA from 3M. In May 2002, because of the threat posed by PFOA to human health and the environment, 3M announced that it would cease to manufacture PFOA altogether. In October 2002—so that it could continue manufacturing a range of profitable Teflon® products— DuPont began making PFOA at its Fayetteville Works facility. It continued to do so until 2013.

105. On May 3, 2001, DuPont submitted a National Pollutant Discharge Elimination System ("NPDES") permit renewal application to North Carolina's Division of Water Quality, subsequently renamed the Division of Water Resources (the "DWR"), a division of DEQ, stating that it intended to begin manufacturing PFOA at Fayetteville Works. During the application process, DuPont represented that: (1) PFOA does not pose a health concern to humans or animals at levels present in the workplace or environment; (2) DuPont had used PFOA for 40 years with no observed health effects on workers; and (3) PFOA is neither a known developmental toxin nor a known carcinogen. DuPont knew or should have known its representations were false.

106. Thereafter in 2006, the E.P.A. began a voluntary PFOA Stewardship Program, in which DuPont participated, designed to prevent C8 from further entering the environment and to eliminate C8 from consumer products by 2015.

107. In 2008, DuPont submitted to E.P.A. notices pursuant to the TSCA of its intent to manufacture GenX.[19]

---

[19] GenX is a name for a chemical known as C3 Dimer Acid (also known as HFPO Dimer Acid). C3

108. DuPont generated GenX – in part as a byproduct – and discharged it from the Site for decades by 2008, but in 2009 DuPont began to purposely manufacture GenX as an alternative to C8.

109. On January 28, 2009, EPA and DuPont entered into a Consent Order governing the manufacture of GenX. The Consent Order provides that "EPA has concerns that [GenX] will persist in the environment, could bioaccumulate, and be toxic . . . to people, wild animals, and birds." The Consent Order also stated that EPA had "human health concerns" regarding GenX and that "uncontrolled . . . disposal of [GenX] may present an unreasonable risk of injury to human health and the environment."

110. Due to these risks, the 2009 EPA Consent Order required DuPont to "recover and capture (destroy) or recycle [GenX] at an overall efficiency of 99% from all the effluent process streams and the air emissions (point source and fugitive)."

111. DuPont and Chemours failed to disclose to DWR the discharge of GenX and related compounds into the Cape Fear River.

112. In particular, none of the DuPont or Chemours NPDES permit applications reference "GenX" or any chemical name, formula, or CAS number that identify any GenX or related compounds in the Fayetteville Works' discharge.

---

Dimer Acid Fluoride (also known as HFPO Dimer Acid Fluoride) and C3 Dimer Acid Ammonium Salt (also known as HFPO Dimer Acid Ammonium Salt) both convert to GenX in the environment. GenX, C3 Dimer Acid Fluoride, and C3 Dimer Acid Ammonium Salt and/or other similar substances are collectively referred to herein as "GenX."

31

113. In fact, information provided by DuPont and Chemours led DWR staff to reasonably believe that GenX was not being discharged into the Cape Fear River. On August 26, 2010, representatives of DuPont met with the DEQ staff regarding the company's anticipated use of GenX technology at the Fayetteville Works as a replacement for PFOA.

114. The information DuPont provided indicated that the GenX would be produced in a closed-loop system that would not result in the discharge of those compounds outside Fayetteville Works, particularly not directly into the Cape Fear River.

115. DuPont represented that the wastewater generated from the manufacture of GenX would be collected and shipped off-site for disposal, and therefore, this wastewater would not be discharged into the Fayetteville Works' wastewater treatment plant or into the Cape Fear River.

116. On April 29, 2011, DuPont submitted an NPDES permit renewal application confirming that "all process wastewater generated from [the PPA Manufacturing Area] is collected and shipped off-site for disposal" and that "no process wastewater from this manufacturing facility is discharged to the Site's biological [waste water treatment plant] or to the Cape Fear River." The application made no mention of GenX or related compounds being discharged into the Cape Fear River.

117. On February 6, 2012, DWR issued a renewal permit with an effective date of March 1, 2012 ("2012 Permit"). The 2012 Permit makes no mention of GenX as part of the authorized discharge from Fayetteville Works.

118. On November 10, 2016, EPA and Dr. Detlef Knappe, a Professor at N.C. State University, published a study that identified the presence of GenX and other PFAS in the Cape Fear River. The study indicated that levels of GenX in one sample area in the Cape Fear River were as high as 4,500 ng/L, which is more than 30 times higher than the health goal later set by DHHS.

119. Only after substantial media coverage in 2017 regarding the presence of GenX in the Cape Fear River did Chemours inform DEQ that it and DuPont had discharged GenX and other PFAS as byproducts for decades at the Fayetteville Works and routinely discharged those byproducts into the Cape Fear River.

120. Then, only after DEQ's request did Chemours provide internal health studies it and DuPont had on GenX—studies that DuPont or Chemours had previously conducted (without disclosing).

121. By that time, DuPont Entities had been discharging PFAS from Fayetteville Works into the Cape Fear River for decades, which led to widespread contamination in New Hanover County.

**H.** *The 2019 Consent Order*

122. After Dr. Knappe's discovery of PFAS in the Cape Fear River, public concern focused on contamination in the River rather than groundwater surrounding

33

the Fayetteville Works Site. Eventually, Chemours and the State of North Carolina sampled wells surrounding the

Fayetteville Works Site and found that a number of residential groundwater wells surrounding the Site had elevated levels of GenX – some even above the then-applicable State of North Carolina's provisional health goal for drinking water of 140 ng/L. Since that time, the standard for GenX in drinking water has been lowered to 10 ppt.[20] Only more recently has testing showed widespread contamination of private wells in New Hanover County.

123.    On February 25, 2019, the State of North Carolina & Cape Fear River Watch entered into a Consent Order with The Chemours Company FC, LLC, which required Chemours to pay a $12 million fine and, among other things, conduct a program to determine the extent of contamination in private groundwater wells around the facility.[21] The full extent of the contamination has not yet been determined, but Defendants' PFAS have been detected in New Hanover County, many miles away from the Site.[22]

---

[20] EPA; Drinking Water Health Advisories for PFAS Fact Sheet for Communities; https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-communities. pdf (last accessed 7/12/2023).

[21] Consent Order, February 25, 2019; https://files.nc.gov/ncdeq/GenX/2019-02-25-Consent-Order---file-stamped- and-fully-executed--b--w-.pdf (last accessed March 10, 2022)

[22] See Residential Sampling Map from the week 7-26-2021; https://edocs.deq.nc.gov/WasteManagement/DocView.aspx?id=1600353&dbid=0&repo=WasteManage ment (last accessed March 10, 2022)

34

124. In addition, the Consent Order requires Chemours to provide replacement drinking water supplies for certain households or entities. For drinking water wells where GenX has been detected at concentrations greater than 10 ng/L, Chemours must provide for connection to a public water supply or, if such connection would cost greater than $75,000, connection to a whole- house filtration system.

125. For drinking water wells where the combined concentration of certain PFASs exceed 70 ng/L or where any individual PFAS exceeds 10 ng/L ("70/10 health goal"), Chemours must provide up to three under-sink reverse osmosis drinking water systems. In practice, this requirement has allowed Chemours to avoid providing whole house filtration to people who desperately need it; for example, some drinking water wells have total PFAS concentrations in the hundreds ppt range, but individuals drinking from those wells do not qualify for a whole house filter because GenX concentrations are below 10 ppt.

126. The Consent Order only considers 12 of the almost 30 PFAS compounds which have been associated with the Fayetteville Works Site. The 12 PFAS are listed on Attachment C and include: PFMOAA, PMPA/PFMOPrA, PFO2HXA, PEPA/PFMOBA, PFO3OA, PFO4DA, PFESA-BP1/Nafion Byproduct 1, PFESA-BP2/Nafion Byproduct 2, PFECA-G, TAFN4/PF05DA, PFHpA, GenX.

127. The Consent Order also required Chemours to control air emissions of "all PFAS at an efficiency of 99.99%" through installation of a thermal oxidizer. Chemours claims to have started operation of the thermal oxidizer later that year in

35

December 2019.[23] Thermal oxidizer technology has been used by industry members for decades, and DuPont and Chemours could have installed the thermal oxidizer decades earlier. Had they done so, the County's harm would have been lessened substantially, if not entirely.

128. Defendants understood the need for technology to control air emissions. When it spun Chemours off in 2015, DuPont knew that the Fayetteville Works Plan had been discharging PFAS into the nearby environment through air emissions for decades. In 2010, DuPont commissioned a "Blue Ribbon Panel" of company managers, scientists and engineers to identify solutions. The Panel provided several recommendations to reduce environmental emissions, one of which would have resulted in nearly the same – if not the exact same – technology required by the 2019 Consent Order to control air emissions.

129. Ultimately, DuPont opted for a band-aid solution. Rather than adopt the panel's recommendations, DuPont installed a $2.3 million gas permeator system to deal with one waste stream (out of many) responsible for certain fluorinated compounds. DuPont terminated the project in late 2013 due to cost concerns. Chemours would have been aware of these facts since its existence in 2015 and failed to control PFAS air emissions until required to do so in the 2019 Consent Order.

---

23

https://www.chemours.com/en/-/media/files/corporate/fayetteville-works/fayetteville-works-thermal-oxidizer-
startup.pdf (last accessed March 10, 2022)

130.    Even after the 2019 Consent Order, and for the indefinite future, Chemours has and will continue to emit PFAS compounds. These emissions eventually make their way to the Cape Fear River, causing additional contamination and a continual and recurring harm to downstream communities including Plaintiff.

131.    Paragraph 21 of the Consent Order required Chemours to fund sampling by a third party laboratory of drinking water wells for a distance of at least one-quarter (1/4) mile beyond the nearest well with test results showing the presence of Defendants' PFAS compounds.

132.    After the Consent Order was signed, private well testing for Fayetteville Works PFAS primarily took place in the communities surrounding the Fayetteville Works facility in Bladen, Cumberland, and Robeson Counties. More recently, Chemours began widespread testing of private wells in New Hanover County. This more recent testing has shown widespread harm in New Hanover County, necessitating action on behalf of the County to protect those residing in and visiting the County.

I.    *DEFENDANTS' STATUTORY VIOLATIONS*

133.    Defendants violated their ongoing duty under both North Carolina and Federal law to disclose to the State of North Carolina any known constituents in their discharges that posed a potential risk to human health, in connection with their NPDES Permit. See, e.g., 15A N.C.A.C. 2H.0105(j)(requiring applicants to disclose "all known toxic components that can be reasonably expected to be in the discharge,

37

including but not limited to those contained in a priority pollutant analysis"); 14A N.C.A.C. 2B.0202(64) (defining toxic substances to include "any substance or combination of substances...which after discharge and upon exposure...has the potential to cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions or suppression in reproduction or growth) or physical deformities in such organisms or their offspring"); 40 C.F.R. § 122.41(l)(8) (requiring, as a standard NPDES permit condition, that "[w]here the permittee becomes aware that it failed to submit any relevant facts in a permit application, or submitted incorrect information in a permit application . . . it shall promptly submit such facts or information."); U.S. Envt'l Prot. Agency, "Revised Policy Statement on Scope of Discharge Authorization and Shield Associated with NPDES Permits," available at https://www3.epa.gov/npdes/pubs/owm0131.pdf.

134.   Defendants also violated, and continue to violate, their duty under the NPDES Permit to take "all reasonable steps to minimize or prevent any discharge . . . in violation of [its] permit with a reasonable likelihood of adversely affecting human health or the environment," 40

C.F.R. § 122.41(d), as well as their duty under North Carolina groundwater regulations to take action to terminate and control any discharge of "waste or hazardous substance to the groundwaters of the State, or in proximity thereto," mitigate any resulting hazards, and notify State regulators. 15A N.C.A.C. 2L .0106(b).

135.    Defendants' ongoing discharges into the Cape Fear River have violated, and continue to violate, North Carolina water quality standards for surface water, in that they:

a.    render the Cape Fear River waters injurious to aquatic life or wildlife, recreational activities, public health, or impair the waters for one or more of their designated uses, 15A N.C.A.C. 02B .0208(a); and

b.    preclude, on a short term and/or long term basis, one or more of the best uses of the water, including as "a source of water supply for drinking, culinary, or food-processing purposes" and for "aquatic life propagation and maintenance of biological integrity (including fishing and fish), wildlife, secondary recreation, [and] agriculture." See 15A N.C.A.C. 2B.0216(2) and 15A N.C.A.C. 2B .0216(1) & .0211(1).

136.    The Fayetteville Works is a major source of air pollution and is required to obtain and operate within a Clean Air Act Title V operating permit. *See* 42 U.S.C. § 7661 et seq.; *see also* N.C. Gen. Stat. §§ 143-215.107(a)(10), 143-215.3(c); 40 C.F.R. pt. 70, app. A. Further, the permit requires the submission of annual emissions inventories to DEQ detailing the Fayetteville Works' actual emissions of various air pollutants into the environment for the previous calendar year. *See* 15A N.C.A.C.

2Q .0207. The accuracy of these reports is required to be certified by a responsible official from the Fayetteville Works. *See id.*

137.    DuPont and Chemours have emitted GenX and other PFAS compounds into the air at levels that far exceed emission rates that they had previously reported to the North Carolina Department of Environmental Quality and its predecessor agencies.

138.    Chemours continues to violate regulations and requirements regarding air pollution from Fayetteville Works. On August 26, 2021, North Carolina Department of Environmental Quality's Division of Air Quality issued a Notice of Violation to Chemours regarding air emissions. Under the Fayetteville Works facility's air permit, Chemours must demonstrate compliance with the GenX emission limit of 23.027 pounds per year. In March 2021, excess GenX emissions resulted in noncompliance with the rolling 12-month totals for March, April, May and June of 2021. As of June 30, 2021, Chemours reported annual GenX emissions of 32.024 pounds.

139.    Starting in 2017, Chemours's annual emissions inventories were required to include GenX. Testing revealed that Chemours was emitting into the air thousands of pounds of GenX per year. Upon information and belief, the PFAS Defendants emitted PFAS for several decades prior to GenX being included in the annual emissions inventories. Such emissions led to widespread dispersal of PFAS. This dispersal of PFAS has harmed New Hanover County.

140. Defendants' ongoing and recurring discharges and emissions of PFAS causing contamination of groundwater have violated, and continue to violate, North Carolina groundwater standards in that these discharges/emissions are comprised of substances which are not naturally occurring and for which no standard is specified but are contaminating groundwater at or above the practical quantitation limit (PQL), as prohibited by 15A N.C.A.C. 2L .0202(c).

141. Defendants have also violated provisions of the Toxic Substances Control Act. On February 13, 2019, the United States Environmental Protection Agency issued a Notice of Violation to The Chemours Company concerning the company's manufacture of new chemicals – including GenX and other PFAS compounds – without proper reporting. The Notice specifically references Chemours' "release of [GenX] to the environment and the [] requirement for Chemours to use [GenX] in an enclosed process." At least some of the violations noted by the EPA related to air emissions from the Fayetteville Works Site.

J. *Contamination in New Hanover County*

142. Defendants have contaminated groundwater across much of New Hanover County. DEQ & Defendants' sampling has established that groundwater, water supply wells, and private wells in New Hanover County are contaminated with PFAS compounds that originated at the Facility.

143. County residents have been exposed to Defendants' PFAS for decades. Continued exposure exacerbates and already existing risk.

41

144. PFAS compounds do not easily break down in the environment. Defendants' PFAS that have been deposited in groundwater, soil, and sediments, and bioaccumulated in vegetation will provide a continuing source of pollution to groundwater in the County for decades.

145. Many residents who rely on private water wells have demanded connections to the public drinking water distribution system operated by Cape Fear Public Utility Authority (CFPUA). CPFUA has, in turn, looked to the County to pay for the provision of water to residents who are not current customers. The County has incurred costs – and will continue to incur costs – to ensure the provision of water throughout New Hanover County as a result of PFAS contamination in private wells.

146. The County has the authority "to remove, abate, or remedy everything that is dangerous or prejudicial to the public health or safety." N.C. Gen. Stat. Ann. § 153A-140. PFAS contamination in the County groundwater (including private wells) is dangerous or prejudicial to the public health and safety of the County and its residents.

147. The County is authorized by North Carolina law to establish water systems to provide water to its residents. See, e.g., N.C. Gen. Stat. Ann. § 153A-275; N.C. Gen. Stat. Ann. § 153A-274.

148. The County has incurred significant costs to investigate the contamination and options for providing water to all residents who are currently relying upon wells contaminated by Defendants' PFAS chemicals. The County has

incurred, and will incur, significant costs to ensure its residents have access to safe drinking water.

149.   As a result of Defendants' PFAS, the County has lost and will continue to lose property tax revenue. Defendants' actions have caused a reduction of property value for many properties. As a result, the taxable values of many County properties are lower than they would be had Defendants' not caused PFAS contamination in the County. Due to lower taxable values, the County has suffered and will suffer a reduction in tax revenue.

150.   In addition, the County holds an ownership interest in other property – including real property – that has been harmed by Defendants' PFAS. Such property includes, but is not limited to, fire station properties and the Wilmington International Airport.

K.   *Dupont's Multi-Step, Fraudulent Scheme to Isolate its Valuable Tangible Assets From its PFAS Liabilities*

151.   DuPont's and Chemours's liabilities for PFOA and other PFAS contamination account for a substantial portion of their environmental liabilities nationwide.

152.   DuPont sought to insulate itself from billions of dollars of legacy PFAS liabilities, especially those arising from PFOA and other PFAS contamination at chemical plants that it owned and operated throughout the country.

153.   Upon information and belief, DuPont's potential cumulative liability related to PFOA and other PFAS is likely billions of dollars due to the persistence,

43

mobility, bioaccumulative properties, and toxicity of these "forever chemicals," as well as DuPont's decades-long attempt to hide the dangers of PFAS from the public.

154.    For more than five decades, DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey and West Virginia and at Fayetteville Works. As alleged above, throughout this time, DuPont was aware that PFOA was toxic, harmful to animals and humans, bio-accumulative, and bio-persistent in the environment. DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment and that tens of thousands of people had been exposed to PFOA, including through public and private drinking water supplies, which DuPont had contaminated. Thus, DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFOA.

155.    For example, in 1999, members of the Tennant family, who owned property impacted by PFOA contamination adjacent to DuPont's Washington Works plant in Parkersburg, West Virginia, sued DuPont in West Virginia federal court.

156.    DuPont's in-house counsel was very concerned about DuPont's exposure related to PFOA. In November 2000, one of DuPont's in-house counsel handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives.  Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this

chemical into the community and the environment because of our concern about the biopersistence of this chemical."

157.    In 2005, after confidentially settling the Tennant case, DuPont agreed to pay $10.25 million to resolve eight counts brought by the EPA alleging violations of TSCA and RCRA. DuPont also was required to commit an additional $6.25 million to supplemental environmental projects.[24]

158.    Also in 2005, DuPont finalized a settlement of a class action lawsuit, which had been filed on behalf of 70,000 residents of Ohio and West Virginia who had been exposed to PFOA that DuPont had discharged from Washington Works, for total class member benefits valued at over $300 million. Under the terms of the settlement, DuPont agreed to fund a panel of scientists (the "Science Panel") to confirm which if any diseases were linked to PFOA exposure, to filter local water for as long as PFOA concentrations exceeded regulatory thresholds, and to pay up to $235 million for ongoing medical monitoring of the affected community for diseases that the Science Panel confirmed to be linked to PFOA exposures (the "Linked Diseases"). The settlement also provided that any class members who developed one or more of the Linked Diseases would be entitled to sue for personal injury and punitive damages, and DuPont could not contest that the class members' exposure to PFOA could cause those Linked Diseases.

---

[24] See
https://www.nytimes.com/2005/12/15/politics/dupont-to-pay-165-million-for-unreported-risks.html
(last accessed August 20, 2021)

45

159.    By 2012, the Science Panel had confirmed that several human diseases had "probable links" to PFOA exposure, including high cholesterol, ulcerative colitis, pregnancy induced hypertension, thyroid disease, testicular cancer, and kidney cancer.

160.    Following the completion of the Science Panel's work in 2012, more than 3,500 individual personal injury and punitive damage claims were filed against DuPont in Ohio and West Virginia by class members who had been diagnosed with one or more of the Linked Diseases under the terms of the 2005 class settlement. These claims were consolidated in the federal multidistrict litigation styled In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation (MDL No. 2433) in the United States District Court for the Southern District of Ohio. Forty "bellwether" trials were scheduled to take place in 2015 and 2016.

161.    DuPont knew that it faced substantial exposure at these trials, as well as liability related to PFOA and other PFAS contamination at other sites throughout the country, including Fayetteville Works, and that its liability was likely billions of dollars.

162.    In light of this significant exposure, upon information and belief, by 2013, DuPont's management began to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that DuPont's PFAS had caused and shield billions of dollars in assets from these substantial liabilities.

46

163. In or about 2013, DuPont and The Dow Chemical Company ("Old Dow") began discussions about a possible "merger of equals." DuPont's management decided to pursue a strategy specifically designed to isolate DuPont's massive legacy liabilities from its valuable tangible assets in order to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

164. DuPont engaged in a three-part plan, which in summary proceeded as follows: The first step in DuPont's plan was to transfer its Performance Chemicals Business (which included Teflon and other products, the manufacture of which involved the use of PFOA and other PFAS) into its wholly owned subsidiary, Chemours. And then, in July 2015, DuPont "spun-off" Chemours as a separate public entity and saddled Chemours with DuPont's massive legacy liabilities (the "Chemours Spinoff").

165. DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities and that DuPont still faced direct liability for its own conduct.

166. Accordingly, DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades-long bad conduct with regard to the environment and PFAS.

167. The second step involved DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which DuPont and

47

Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"). DuPont and Old Dow became subsidiaries of DowDuPont.

168. Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions was to transfer, either directly or indirectly, a substantial portion of DuPont's assets to DowDuPont.

169. The third step involved DowDuPont spinning off two new companies: (i) Corteva, which currently holds DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow"), which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

170. As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of DuPont's tangible assets decreased by $20.85 billion.

171. New DuPont and New Dow now hold the vast majority of the tangible assets that DuPont formerly owned.

172. Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various agreements. Upon information and belief, DuPont, New DuPont, and Corteva have intentionally buried these details in an attempt to hide from potential judgment creditors, like The County, details regarding where DuPont's valuable assets went and the inadequate consideration that DuPont received in return.

173.   In greater detail, the restructuring was implemented as follows:

**Step 1: The Chemours Spinoff**

174.   Prior to July 1, 2015, Chemours was a wholly owned subsidiary of DuPont. On July 1, 2015, DuPont completed the spinoff of its Performance Chemicals Business, and Chemours became a separate, publicly traded entity.

175.   The Performance Chemicals Business included the business units that had manufactured, used, and discharged PFOA into the environment.

176.   To effectuate the Chemours Spinoff, DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

177.   Pursuant to the Chemours Separation Agreement, DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants. Upon information and belief, the Fayetteville Works was one of the 37 sites referenced in the Separation Agreement and one or more schedules to that Agreement.

178.   DuPont completed a significant internal reorganization prior to the Chemours Spinoff to ensure the transfer of all of its Performance Chemicals Business assets to Chemours.

179.   At the same time, Chemours accepted a broad assumption of DuPont's massive liabilities relating to DuPont's Performance Chemicals Business, including those arising from its discharge of contaminants, such as PFOA and other PFAS, into the environment. The specific details regarding the nature and value of probable

maximum loss, and anticipated timing of the liabilities that Chemours assumed, are set forth in the nonpublic schedules and exhibits to the Chemours Separation Agreement.

180. Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

181. Thus, in total, Chemours distributed approximately $3.9 billion to DuPont.

Chemours funded these distributions by entering into approximately $3.995 billion of financing transactions on May 12, 2015. Also, Chemours distributed common stock to DuPont shareholders on July 1, 2015.

182. The Chemours Separation Agreement requires Chemours to indemnify DuPont against, and assume for itself, all "Chemours Liabilities," which include DuPont's liabilities relating to and arising from its decades of emitting pollution, including PFOA, into the environment from its dozens of facilities.

183. Notably, Chemours sued DuPont in Delaware state court in 2019, alleging among other things, that if (i) the full value of DuPont's PFAS and environmental liabilities were properly estimated, and (ii) the liabilities that the Chemours Separation Agreement imposes were not limited by a court, then Chemours would have been insolvent at the time it was spun off from DuPont.

184. It is apparent that DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products and, in so doing, shield DuPont.

185. Not surprisingly, given DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from DuPont.

186. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

187. However, Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from DuPont with respect to PFAS and that DuPont and Chemours knew or should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at DuPont and Chemours facilities.

188. Had the full extent of DuPont's legacy liabilities been taken into account, as they should have been, at the time of the Chemours Spinoff, Chemours would have been rendered insolvent at that time.

**Step 2: The Old Dow/ DuPont "Merger"**

189.     After the Chemours Spinoff, DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals Business that DuPont had transferred to Chemours rested solely with Chemours, and not with DuPont.

190.     Of course, DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and DuPont remained liable for the liabilities it had caused and Chemours had assumed. So DuPont moved to the next phase of its fraudulent scheme.

191.     On December 11, 2015, less than six months following the Chemours Spinoff, DuPont and Old Dow announced that they would combine in an "all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. ("the Dow-DuPont Merger"). As a result of the Dow-DuPont Merger, and in accordance with the Dow-DuPont Merger Agreement, Old Dow and DuPont each became wholly owned subsidiaries of DowDuPont.

**Step 3:  The Shuffling, Reorganization, and Transfer of Valuable Assets Away from DuPont and Separation of Corteva and New Dow**

192.     Following the Dow-DuPont Merger, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of DuPont's assets out of the company.

193.    While, again, the details of these transactions remain hidden from The County and other judgment creditors, it is apparent that the transactions were intended to frustrate and hinder creditors with claims against DuPont, including with respect to its PFAS liabilities.

194.    DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Materials Science Business."

195.    While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that DuPont transferred a substantial portion of its valuable assets to DowDuPont for far less than the assets were worth.

196.    DowDuPont then incorporated, and ultimately spun off, Corteva and New Dow, to hold two of the three newly formed business lines.

197.    The April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the "DowDuPont Separation Agreement") governs the separations of Corteva and New Dow. The agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business), and New DuPont

(Specialty Products Business). New DuPont also retained several "noncore" business segments and product lines that once belonged to DuPont.

198. The separation of New Dow was completed on or about April 1, 2019.

199. On or about May 2, 2019, DowDuPont consolidated the Agricultural Business line into DuPont, and then, on or about May 31, 2019, it "contributed" DuPont to Corteva. The following day, on June 1, 2019, DowDuPont spun off Corteva as an independent public company. On or about June 1, 2019, DowDuPont changed its registered name to Du Pont de Nemours, Inc. (i.e., New DuPont).

200. Pursuant to the DowDuPont Separation Agreement, Corteva and New DuPont assumed direct financial liability of DuPont, including liability that was not related to the Agriculture, Materials Science, or Specialty Products Businesses, including upon information and belief, DuPont's legacy PFAS liabilities. These assumed PFAS liabilities are allocated on a pro rata basis between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, liabilities are allocated 71% to New DuPont and 29% to Corteva.

201. While New DuPont and Corteva have buried the details in nonpublic schedules, upon information and belief, this allocation applies to DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including The County's claims in this case. The County can therefore bring claims

against New DuPont and Corteva directly for DuPont's contamination and harm to The County.

**The Effect of the Years-Long Scheme to Defraud New Hanover County and Avoid Financial Responsibility for Legacy Liabilities**

202.    The net result of these transactions was to strip away valuable tangible assets from DuPont and transfer those assets to New DuPont and Corteva for far less than the assets were worth. As a result, DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

203.    In addition, DuPont owes a debt to Corteva of approximately $4 billion. Recent SEC filings demonstrate the substantial deterioration of DuPont's finances and the drastic change in its financial condition before and after the above transactions.

204.    For example, for the year ended 2014, prior to the Chemours Spinoff, DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the year ended 2019, just months after the Corteva separation, however, DuPont reported a net loss of $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

205.    The value of DuPont's tangible assets further underscores DuPont's precarious financial situation. For the year ended 2014, prior to the Chemours

Spinoff, DuPont owned nearly $41 billion in tangible assets. For the year ended 2019, DuPont owned just under $21 billion in tangible assets.

206. Moreover, DuPont's reported liabilities for the same period totaled $21.869 billion. DuPont's tangible net worth had declined to negative $1.125 billion.

207. The County cannot take comfort in any allocation of liability to New DuPont and Corteva. Neither of those Defendants has publicly conceded that it assumed any portion of DuPont's historical environmental and PFAS liabilities. And it is far from clear that either entity will be able to satisfy future judgments.

208. Indeed, New DuPont is in the process of divesting tangible assets that it received from DuPont and for which DuPont has received less than reasonably equivalent value.

209. New DuPont has received or will receive significant proceeds on the sales of DuPont's former business segments and product lines.

210. As just one example, in December 15, 2019, New DuPont agreed to sell the Nutrition and Biosciences business to International Flavors & Fragrances for $26.2 billion, and that transaction is scheduled to close in early 2021.

211. Corteva—to which 29% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the debt owed to it by DuPont. But DuPont does not have sufficient tangible assets to satisfy this debt obligation.

## FIRST CAUSE OF ACTION
## PRODUCTS LIABILITY- INADEQUATE DESIGN (G.S. § 99B-6)
### As to all Manufacturing Defendants

212.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

213.   Plaintiff was harmed by PFAS-containing products including AFFF which were designed, manufactured, sold, and distributed by Defendants, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

214.   The design of Defendants' PFAS-containing products were defective because, at the time of the products' manufacture, Defendant acted unreasonably in designing or formulating the product, and this conduct was a proximate cause of the Plaintiff's harm.

215.   In addition, at the time the products left Defendants' control, each Defendant unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation that could then have been reasonably adopted and that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

216.   Moreover, at the time the product left Defendants' control, the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design.

217. The design of Defendants' PFAS-containing products caused harm to Plaintiff.

218. The design of Defendants' PFAS-containing products was a substantial factor in causing harm to Plaintiff.

219. The gravity of the huge environmental harm resulting from the use of Defendants' PFAS-containing products was, is, and will be enormous because PFAS contamination is widespread, persistent, and toxic.

220. The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that Defendants' PFAS-containing products were toxic, could not be contained, and do not readily degrade in the environment.

221. Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

222. Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## SECOND CAUSE OF ACTION
## PRODUCTS LIABILITY- FAILURE TO WARN (G.S. § 99B-5)
### As to all Manufacturing Defendants

223. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

58

224.  Plaintiff was harmed by PFOA, PFOS, and other PFAS-containing products that Defendants designed, manufactured, sold, and distributed.

225.  Defendants' PFAS-containing products were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

226.  Defendants' PFAS-containing products were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

227.  The potential environmental hazard and toxicity risks of Defendants' PFAS- containing products were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendants' superior knowledge about their products at the time of design, manufacture, sale, and distribution.

228.  The potential environmental hazard and toxicity risks presented an unreasonably dangerous condition when Defendants' PFAS-containing products were and are used or misused in an intended or reasonably foreseeable way, and Defendants knew that this condition posed a substantial risk of harm to reasonably foreseeable users and bystanders including public water providers like Plaintiff.

229.  The risks of PFAS are not a matter of common knowledge. Ordinary consumers and third-parties would not have recognized the potential risks.

230.  Defendants failed to adequately warn or instruct of the potential risks.

231.  Plaintiff was, is, and will be harmed.

232.  The lack of sufficient instructions or warnings was a substantial factor in causing Plaintiff's harm.

233.  Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

234.  Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## THIRD CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (G.S. § 25-2-314)
### (As to all Manufacturing Defendants)

235.  Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

236.  At all relevant times, Defendants were in the business of designing, manufacturing, selling, and distributing PFAS-containing products such as those at issue here.

237.  Defendants warranted that their PFAS-containing products are merchantable.=

238.  Defendants designed, manufactured, sold, and distributed PFAS-containing products without adequate warning of toxicity, potential human health risks, and environmental hazards.

60

239. Defendants' PFAS-containing products were defective or otherwise unmerchantable when they left Defendants' control.

240. When used for the ordinary purposes for which such PFAS-containing products were used and intended, PFAS-containing products were defective or otherwise unmerchantable because PFAS compounds escaped from those products, causing contamination of soil and water and presenting risks to human and environmental health.

241. Defendants breached their implied warranty of merchantability because the goods are not fit for the ordinary purposes for which such goods are used.

242. Defendants breached their implied warranty of merchantability because the PFAS-containing products were not packaged and labeled with the appropriate warnings about contamination and resulting health risks or with instructions that would have prevented the contamination.

243. Defendants became aware of the human health risks and environmental dangers presented by PFAS-containing products by no later than the year 2000.

244. Plaintiff was, is, and will be harmed.

245. Defendants' breach of the implied warranty of merchantability proximately caused Plaintiff's harm.

246. Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

61

247.   Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## FOURTH CAUSE OF ACTION
## NEGLIGENCE
### (As to the DuPont Entities' Activities at Fayetteville Site)
### TRESPASS TO REAL PROPERTY
### (As to DuPont Entities' Activities at Fayetteville Site)

269.   Plaintiff incorporates by reference all other paragraphs of this Complaint as fully set forth here, and further allege as follows.

270.   Defendants' operation of the Fayetteville Works facility, and their discharges, emissions, and releases of PFAS chemicals, have resulted in an unauthorized entry by Defendants upon real property owned by Plaintiff or in which Plaintiff has a property interest.

271.   Defendants' unauthorized entry upon Plaintiff's property has resulted in substantial injury, damage, and harm to Plaintiff and constitutes a trespass to real property.

272.   Defendants' conduct in secretly releasing their persistent, bioaccumulative, and toxic perfluoroalkyl substances into New Hanover County and contaminating the drinking water for thousands of County residents, all the while misleading state and Federal regulators and the public, was willful and wanton, in that Defendants acted with a conscious disregard for and indifference to the rights

and safety of others, which Defendants knew or should reasonably have known was reasonably likely to result in injury, damage or harm.

273. Defendants' willful and wanton conduct caused Plaintiff to suffer injury, damages, and harm as set forth above, for which Plaintiff seeks punitive damages as allowed by law.

274. Plaintiff seeks all legal and equitable relief as allowed by law, including inter alia actual damages in an amount to be proven at trial, and all costs and expenses of suit and pre- and post-judgment interest.

275. Upon information and belief, Corteva and New DuPont assumed Dupont's liability described above.

276. Plaintiff seeks all legal and equitable relief as allowed by law, including inter alia actual damages in an amount to be proven at trial, and all costs and expenses of suit and pre- and post-judgment interest.

## SEVENTH CAUSE OF ACTION
## PRIVATE NUISANCE
### (As to DuPont Entities' Activities at Fayetteville Site)

277. Plaintiff incorporates by reference all other paragraphs of this Complaint as fully set forth here, and further allege as follows.

278. Defendants' operation of the Fayetteville Works facility, and their discharges, emissions, and releases of PFAS chemicals constitute an unreasonable use of Defendants' land which has caused substantial and unreasonable interference with Plaintiff's use and enjoyment of their property and the health of its residents.

63

279.	As a direct and proximate result of Defendants' conduct that created a nuisance, Plaintiff has incurred injuries, damage, and harm as set forth above. Defendants are liable for damages in an amount to be proven at trial.

280.	The nuisance Defendants have created is ongoing and the harm to Plaintiff will continue indefinitely.

281.	Defendants' conduct in secretly releasing their persistent, bioaccumulative, and toxic perfluoroalkyl substances into New Hanover County and contaminating the drinking water for thousands of County residents, all the while misleading state and Federal regulators and the public, was willful and wanton, in that Defendants acted with a conscious disregard for and indifference to the rights and safety of others, which Defendants knew or should reasonably have known was reasonably likely to result in injury, damage or harm.

282.	Defendants' willful and wanton conduct caused Plaintiff to suffer injury, damages, and harm as set forth above, for which Plaintiff seeks punitive damages as allowed by law.

283.	Plaintiff seeks all legal and equitable relief as allowed by law, including inter alia actual damages in an amount to be proven at trial, and all costs and expenses of suit and pre- and post-judgment interest.

284.	Upon information and belief, Corteva and New DuPont assumed Dupont's liability described above.

64

## EIGHTH CAUSE OF ACTION
## PUBLIC NUISANCE
### (As to DuPont Entities' Activities at Fayetteville Site)

285.   Plaintiff incorporates by reference all other paragraphs of this Complaint as fully set forth here, and further allege as follows.

286.   Defendants' conduct in secretly releasing persistent, bioaccumulative, and toxic perfluoroalkyl substances into New Hanover County, all the while misleading state and Federal regulators and the public, was willful and wanton, in that Defendants acted with a conscious disregard for and indifference to the rights and safety of the public by contaminating the drinking water for thousands of County residents, which Defendants knew or should reasonably have known was reasonably likely to result in injury, damage or harm and constitute a public nuisance.

287.   Defendants' operation of the Fayetteville Works facility, and their discharges, emissions, and releases of PFAS chemicals, therefore, caused a public nuisance that unreasonably contaminated the groundwater in the County and endangers the health of thousands of County residents.

288.   The condition created by Defendants affects a substantial number of people who use groundwater in the County as a drinking water supply and interferes with the rights of the public at large to clean and safe drinking water.

289.   An ordinary person would be reasonably annoyed or disturbed by the presence of PFAS chemicals in their drinking water.

290. The seriousness of the environmental and human health risk Defendants have created far outweighs any social utility of Defendants' conduct.

291. Continuing harm caused by Defendants includes not only their ongoing emissions and releases of PFAS chemicals but also the continued propagation of Defendants' historical releases of PFAS chemicals through migration in groundwater, leaching from soil, and release from sediments.

292. Defendants knew or, in the exercise of reasonable care, should have known that their manufacturing operations at the Fayetteville Works Site were causing the type of contamination now found in groundwater in New Hanover County. Defendants knew of the bioaccumulative, persistent properties of PFAS and that the Fayetteville Works Site had emitted PFAS chemicals for decades. Defendants knew that their PFAS chemicals would contaminate the water supply of thousands in New Hanover County. In addition, Defendants knew that at least some PFAS chemicals – like PFOA – are associated with serious toxic effects and cancers in humans exposed through drinking water, and that other PFAS compounds – like GenX among others – are associated with serious toxic effects in animals, have not been studied in humans, and present a likely risk to human health. As a result, it was foreseeable to Defendants that humans may be exposed to PFAS chemicals by water drawn from groundwater wells in New Hanover County. Defendants thus knew, or should have known, that their contamination would seriously and

66

unreasonably interfere with the ordinary comfort, use, and enjoyment of groundwater in New Hanover County.

293. Defendants' interference has caused a public health hazard in New Hanover County and damaged one of its natural resources. The condition created by Defendants adversely affects the quality of the water drawn from groundwater in New Hanover County, and thus injuriously affects the community at large and the public health.

294. Pursuant to N.C. General Statute § 153A-140, as a county of North Carolina, New Hanover County "shall have authority . . . to remove, abate, or remedy everything that is dangerous or prejudicial to the public health or safety."

295. New Hanover County "may define and abate nuisances" pursuant to N.C. General Statute § 153A-121.

296. As a direct and proximate result of Defendants' creation of this public nuisance, Plaintiff has incurred and will incur substantial costs to protect the public health and safety of thousands of County residents whose sole source of drinking water is contaminated by Defendants' PFAS chemicals. Additionally, as a result of this public nuisance, the County will receive substantially less money through tax revenue.

297. Defendants' willful and wanton conduct caused Plaintiff to suffer injury, damages, and harm as set forth above, for which Plaintiff seeks punitive damages as allowed by law.

298.    Plaintiff seeks all legal and equitable relief as allowed by law, including inter alia actual damages in an amount to be proven at trial, all amounts necessary to abate the public nuisance Defendants created, and all costs and expenses of suit and pre- and post-judgment interest.

299.    Upon information and belief, Corteva and New DuPont assumed Dupont's liability described above.

### NINTH CAUSE OF ACTION
### CIVIL CONSPIRACY
### (As to Manufacturing Defendants)

300.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

301.    At all times relevant to this lawsuit, Defendants actually knew of the hazards that PFOA and PFOS posed to the environment, including Plaintiff's Property.

302.    Beginning in the 1960s and continuing through the date of the filing of this Complaint, Defendants agreed to engage in unlawful and wrongful acts that caused damage to the Plaintiff. Each Defendant performed at least one overt act in furtherance of this conspiracy. Specifically, Defendants colluded for the avowed purpose of providing information about AFFF products containing PFOA and/or PFOS to the public and the government, with the true, unlawful purpose of:

68

a. intentionally misrepresenting to the EPA and the public that AFFF containing PFOA and/or PFOS was safe and did not pose a risk to human health and the environment;

b. concealing the dangers of AFFF containing PFOA and/or PFOS, including the products' characteristics and their propensity to contaminate soil and groundwater, from the government and public by, among other means, repeatedly misrepresenting how products containing PFOA and/or PFOS were being disposed of;

c. concealing the dangers of PFOA and/or PFOS from consumers and the public; and

d. using their considerable resources to fight legislation concerning PFOA and PFOS.

303. As a direct and proximate result of Defendants' conspiracy, Defendants' AFFF products at all times relevant to this litigation have:

e. posed and continue to pose a threat to Plaintiff's Property;

f. contaminated and will continue to contaminate Plaintiff's Property;

g. contaminated and will continue to contaminate the soil, surface and groundwater on and within the vicinity of Plaintiff's Property;

h. required and will continue to require testing and monitoring of Plaintiff's Property for PFOA and PFOS contamination;

69

i. required or will require remediation of PFOA and PFOS contamination or, where remediation is impracticable or insufficient for Plaintiff, removal and disposal of the contamination;

j. diminished Plaintiff's confidence in, and the use and enjoyment of, Plaintiff's Property;

k. diminished Plaintiff's Property value due to actual, impending, and/or threatened PFOA and PFOS contamination; and

l. caused and/or will cause Plaintiff to sustain substantially increased damages and expenses resulting from the loss of the safety, use, benefit and/or enjoyment of its property.

## TENTH CAUSE OF ACTION
## NEGLIGENCE PER SE
### (As to DuPont Entities' Activities at Fayetteville Site)

304. Plaintiff incorporates by reference all other paragraphs of this Complaint as fully set forth here, and further allege as follows.

305. Defendants' conduct violates federal and state public safety requirements that are intended to protect human health and the environment, as set forth above. Relevant legal requirements include, but are not limited to, those provided by Defendants' NPDES permit, the North Carolina Water and Air Pollution Control, and North Carolina Groundwater Standards.

306. Plaintiff is within the class of persons the violated state and federal

70

statutes and regulations are intended to protect, and their injuries are of the nature contemplated by the statutes and regulations.

307. Defendants' negligence per se directly and proximately caused Plaintiff's injury, damage, and harm as set forth above.

308. Defendants' conduct in secretly releasing their persistent, bioaccumulative, and toxic perfluoroalkyl substances into New Hanover County and contaminating the drinking water for thousands of County residents, all the while misleading state and Federal regulators and the public, was willful and wanton, in that Defendants acted with a conscious disregard for and indifference to the rights and safety of others, which Defendants knew or should reasonably have known was reasonably likely to result in injury, damage or harm.

309. Defendants' willful and wanton conduct caused Plaintiff to suffer injury, damages, and harm as set forth above, for which Plaintiff seeks punitive damages as allowed by law.

310. Plaintiff seeks all legal and equitable relief as allowed by law, including inter alia actual damages in an amount to be proven at trial, and all costs and expenses of suit and pre- and post-judgment interest.

311. Upon information and belief, Corteva and New DuPont assumed Dupont's liability described above.

## ELEVENTH CAUSE OF ACTION
## PUBLIC NUISANCE
### (As to Manufacturing Defendants)

312.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

313.    Defendants manufactured, distributed, marketed, and promoted PFAS-containing products including AFFF in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of Plaintiff's Property.

314.    The presence of PFAS interferes with the use of Plaintiff's Property as a source of drinking water supply.

315.    The presence of PFAS causes significant costs, inconvenience and annoyance to Plaintiff, who is charged with supplying potable drinking water to residences, schools, businesses, churches, and public buildings in the County.

316.    The condition affects a substantial number of people in the community who rely upon Plaintiff to provide water for residential, commercial, and recreational purposes and interferes with the rights of the public at large to clean and safe drinking water resources and environment.

317.    An ordinary person would be reasonably annoyed or disturbed by the presence in public drinking water of toxic PFAS that endanger human health and degrade water quality.

318.    The seriousness of the environmental and human health risk far

outweighs any social utility of Defendants' conduct in manufacturing PFAS and PFAS-containing products and concealing the dangers posed to human health and the environment.

319. Plaintiff has suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and Plaintiff has incurred substantial costs to remove PFAS from its water supply.

320. Plaintiff did not consent to the conduct that resulted in the contamination of Plaintiff's Property.

321. Defendants' conduct was a substantial factor in causing the harm to Plaintiff.

322. Defendants knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PFAS-containing products was causing the type of contamination now found in and around Plaintiff's Property. Defendants knew that PFAS would contaminate water supplies and are associated with serious illnesses and cancers in humans. Defendants thus knew, or should have known, that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of public water supply & intakes.

323. As a direct and proximate result of Defendants' creation of a public nuisance, Plaintiff has suffered, and continues to suffer, monetary damages to be proven at trial.

324. Defendants' conduct was malicious, oppressive, wanton, willful,

73

Case 7:24-cv-00097-FL    Document 1-1    Filed 02/19/24    Page 78 of 88

intentional, and shocks the conscience, warranting punitive and exemplary damages, because they manufactured, promoted, sold, and supplied PFAS-containing products including AFFF, knowing that these products would release PFAS that are toxic, cannot be contained, and last for centuries.

### TWELFTH CAUSE OF ACTION
### PRIVATE NUISANCE
### (As to Manufacturing Defendants)

325.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

326.    Plaintiff's Property has been contaminated by PFOA and/or PFOS as a direct and proximate result of the acts and omissions of Defendants as set forth above.

327.    PFAS contamination is a substantial and unreasonable interference with the use of Plaintiff's Property to provide potable drinking water. The chemicals contaminate Plaintiff's Property and threaten the health of everyone in the community who relies upon Plaintiff to provide potable water.

328.    PFAS contamination caused by Defendants' conduct has damaged Plaintiff's Property and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiff's property.

## THIRTEENTH CAUSE OF ACTION
## FRAUDULENT TRANSFER

### (Actual Fraudulent Transfer in Relation to the
### Chemours Spinoff – As Against DuPont,
### Chemours, Corteva, and New DuPont)

329. Plaintiff repeats each allegation above as though fully set forth in its entirety herein.

330. New Hanover County is and was a creditor of Chemours at all relevant times.

331. Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to the Separation Agreement (the "Assumed Liabilities").

332. The Chemours Transfers and Assumed Liabilities were made for the benefit of DuPont.

333. At the time that the Chemours Transfers were made and the Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, DuPont was in a position to control Chemours.

334. Chemours made the Chemours Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours.

335. New Hanover County has been harmed as a result of the Chemours Transfers.

336.   Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

337.   Under Del. Code tit. 6 §§ 1301 to 1312 and N.C. Gen. Stat. §§ 39-23.4, -23.5, and -23.7, New Hanover County is entitled to void the Chemours Transfers and to recover property or value transferred to DuPont.

### FOURTEENTH CAUSE OF ACTION
### FRAUDULENT TRANSFER

**(Constructive Fraudulent Transfer in Relation to the
Chemours Spinoff – As Against DuPont, Chemours,
Corteva, and New DuPont)**

338.   Plaintiff repeats each allegation as though fully set forth in its entirety herein.

339.   New Hanover County is and was a creditor of Chemours at all relevant times.

340.   Chemours did not receive reasonably equivalent value from DuPont in exchange for the Chemours Transfers and Assumed Liabilities.

341.   Each of the Chemours Transfers and Chemours' assumption of the Assumed Liabilities was made to or for the benefit of DuPont.

342.   At the time that the Chemours Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to control Chemours.

76

343.  Chemours made the Chemours Transfers and assumed the Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

344.  Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Assumed Liabilities.

345.  At the time that the Chemours Transfers were made and Chemours assumed the Assumed Liabilities, DuPont and Chemours intended Chemours to incur or believed or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

346.  New Hanover County has been harmed as a result of the Chemours Transfers.

347.  Upon information and belief, Corteva and New DuPont assumed DuPont's liability described above.

348.  Under Del. Code tit. 6 §§ 1301 to 1312 and N.C. Gen. Stat. §§ 39-23.4,-23.5, and -23.7, New Hanover County is entitled to void the Chemours Transfers and to recover property or value transferred to DuPont.

## FIFTEENTH CAUSE OF ACTION
## FRAUDULENT TRANSFER

**(Actual Fraudulent Transfer in Relation to the Dow-DuPont
Merger and Subsequent Restructurings, Asset Transfers,
and Separations – As Against DuPont, New DuPont, and
Corteva)**

349.   Plaintiff repeats each allegation above as though fully set forth in its entirety herein.

350.   New Hanover County is and was a creditor of DuPont at all relevant times.

351.   Through its participation in the Dow-DuPont Merger, and through the separations of New DuPont, New Dow, and Corteva, DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "DuPont Transfers").

352.   The DuPont Transfers were made for the benefit of New DuPont and/or Corteva.

353.   At the time that the DuPont Transfers were made, New DuPont was in a position to control DuPont and Corteva.

354.   DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors.

355.   New Hanover County has been harmed as a result of the DuPont Transfers.

356.   DuPont engaged in acts in furtherance of a scheme to transfer its assets

78

out of the reach of parties such as New Hanover County that have been damaged as a result of the actions described in this Complaint.

357. Under Del. Code tit. 6 §§ 1301 to 1312 and N.C. Gen. Stat. §§ 39-23.4, -23.5, and -23.7, New Hanover County is entitled to void the DuPont Transfers and to recover property and value transferred to New DuPont and Corteva.

358. New Hanover County also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to DuPont, and seeks a constructive trust over such proceeds for the benefit of New Hanover County.

## SIXTEENTH CAUSE OF ACTION
## FRAUDULENT TRANSFER

**(Constructive Fraudulent Transfer in Relation to the
Dow-DuPont Merger and Subsequent Restructurings, Asset
Transfers, and Separations– As Against DuPont, New
DuPont, and Corteva)**

359. Plaintiff repeats each allegation above as though fully set forth in its entirety herein.

360. New Hanover County is and was a creditor of DuPont at all relevant times.

361. DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the DuPont Transfers.

362. Each of the DuPont Transfers was made to or for the benefit of New

79

DuPont and/or Corteva. At the time that the DuPont Transfers were made, New DuPont control DuPont and Corteva.

363. DuPont made the DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

364. DuPont was insolvent at the time or became insolvent as a result of the DuPont Transfers.

365. At the time that the DuPont Transfers were made, DuPont intended to incur, or believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

366. New Hanover County has been harmed as a result of the DuPont Transfers.

367. Under Del. Code tit. §§ 1301 to 1312 and N.C. Gen. Stat. §§ 39-23.4, -23.5, and - 23.7, New Hanover County is entitled to void the DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

368. New Hanover County also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to DuPont, and seeks a constructive trust over such proceeds for the benefit of New Hanover County.

## VI.    JURY TRIAL

Plaintiff respectfully demands a jury trial pursuant to North Carolina Rule of Civil Procedure 38.

## VII.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Court grant the following relief:

1.    Entry of judgment for Plaintiff and against Defendants for compensatory and punitive damages. Relief demanded is for damages incurred or to be incurred in excess of twenty-five thousand dollars ($25,000);

2.    Entry of relief as necessary to abate the nuisance caused by Defendants and to prevent continuing injury and damages to Plaintiff;

3.    Granting of equitable relief to cure DuPont's and Chemours's deceptive practices and ordering disgorgement of DuPont's and Chemours's profits from its unfair and deceptive acts and practices;

4.    Enjoining New DuPont from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

5.    Imposing a constructive trust over any such proceeds for the benefit of New Hanover County;

6.    Ordering that Plaintiff is entitled to avoid the DuPont Transfers and the Chemours Transfers to the extent necessary to satisfy the Plaintiff's claims;

7. Awarding Plaintiff prejudgment interest and attorneys' fees and costs; and

8. For such other and further relief as the Court deems just and proper.

This the 12th day of January, 2024.

A. Charles Ellis (NC Bar No. 10865)
**Ward and Smith, P.A.**
Post Office Box 8088
Greenville, NC 27835-8088
Telephone: 252-215-4009
ace@wardandsmith.com

Scott Summy (NC Bar No. 27171)
Cary McDougal (TX Bar No. 13569600)
Carla Burke Pickrel (TX Bar No. 24012490)
Brett Land (NC Bar No. 60697)
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 521-3605
ssummy@baronbudd.com
cmcdougal@baronbudd.com
cburkepickrel@baronbudd.com
bland@baronbudd.com

J. Harold Seagle (NC Bar No. 8017)
**Seagle Law, PLLC**
Post Office Box 15307
Asheville, NC 28813
haroldseagle@charter.net
828-545-7777

Philip F. Cossich, Jr.
Brandon J. Taylor (LA Bar No. 27662)
Darren Sumich (LA Bar No. 23321)
David A. Parsiola (LA Bar No. 21005)
Christina M. Cossich (LA Bar No. 32407)
Andrew Cvitanovic (LA Bar No. 34500)
Luana N. Smith (LA Bar No. 35534)
**COSSICH, SUMICH, PARSIOLA**
**& TAYLOR, LLC**
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000

*Attorneys for Plaintiff*

83